UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
                          )
MANUEL LICUDINE,          )
                          )
           Plaintiff,     )
                          )
     v.                   )    Civil Action No. 08-1086 (JR)
                          )
DONALD C. WINTER,         )
Secretary of the Navy,    )
                          )
           Defendant.     )
                          )
```

**MEMORANDUM OPINION**

This matter is before the Court on defendant's motion to dismiss.[1]  With the assistance of *amicus curiae*, the motion is fully briefed.[2]  For the reasons discussed below, the Court grants defendant's motion and dismisses this action.

I.  BACKGROUND

Plaintiff Manuel Licudine ("Licudine") alleges that he was born in the Commonwealth of the Philippine Islands in 1945.[3]

---

[1]    The Court notes defendant's challenge to personal jurisdiction, *see* P. & A. in Support of Def.'s Mot. to Dismiss at 1 n.1, and presumes without deciding that service of process was effected properly.

[2]    The Court appreciates the substantial contributions of Aderson B. Francois, Esq., who graciously accepted an appointment as *amicus curiae* in this matter, with the assistance of Leigh Chapman, Jennifer Jordan and Aristotle Theresa, student attorneys with the Civil Rights Clinic at the Howard University School of Law.

[3]    In his opposition, Licudine alleges that he was born in September 1937.  P. & A. in Support of Pl.'s Mot. Not to Dismiss
(continued...)

1

Compl. at 6.   According to Licudine, he obtained United States citizenship because, from the end of the Spanish-American War until the Philippines became an independent state in 1946, the United States exercised such control over the Philippine Islands "that the United States and the Philippine Islands should constitute a singel [sic] state."  *Id.*  By virtue of his birth in the Philippine Islands and "under the doctrine of 'jus soli,'"[4] Licudine asserts that he is not only a citizen of the Philippines but also a citizen of the United States by operation of the Fourteenth Amendment to the United States Constitution, *id.*, which in relevant part provides:

> All persons <u>born</u> or naturalized <u>in the United States</u>, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside.

U.S. Const. amend. XIV, § 1 (emphasis added).

From February 13, 1973 until his termination effective July 10, 1992, Licudine was employed by the United States Navy at a facility in the Philippines.  *See* Compl., Attach. (Notification of Personnel Action).  In February 2008, Licudine filed a formal discrimination complaint against the Navy under Title VII of the

---

[3](...continued)
[#12] at 7.  The discrepancy in the dates of Licudine's birth is not dispositive, as either birth date falls during the so-called territorial period of the Philippine Islands.

[4]    "Jus soli" is defined as the "rule that a child's citizenship is determined the place of birth."  Black's Law Dictionary 878 (8th ed. 1999).

Civil Rights Act of 1964, *see* 42 U.S.C. § 2000e, *et seq.*, as
amended ("Title VII"), alleging that the Navy discriminated
against him on the basis of his national origin (Filipino) by
failing to inform him of an opportunity, available from
January 8, 1988 until January 8, 1990, to participate in the
federal civil service retirement system.  *See* Compl. at 1-2 &
Attach.  (February 21, 2008 Notice of Dismissal of Formal
Complaint, DON # 08-61581-00514).  The Navy dismissed his
complaint for the reasons set forth in a memorandum to Licudine's
representative:

> At 29 CFR 1614.103(c)4 it states that "Aliens
> employed in positions, or who apply for
> positions, located outside the limits of the
> United States" are not covered under Title
> VII.  Your client has provided no evidence
> that he is a U.S. citizen either by birth or
> naturalized, and therefore does not have
> standing to file a claim. . . .  Although he
> cites that he should be considered an
> employee, he does not provide documentation
> that he is a U.S. citizen, which is the issue
> in determining if a complaint can be accepted
> for formal processing under Title VII.  Your
> client cites reasons as to why he should have
> been covered under the civil service
> retirement system.  This dismissal is not
> based on the merits of the complainant's
> claim that he should have been covered under
> the civil service retirement system.  The
> dismissal of the instant case is based solely
> on the employee's status as a non-U.S.
> citizen and therefore he has no standing to
> file a claim of discrimination under [29
> C.F.R. § 1614].  Under the Commission's
> regulatory pre-complaint procedures, EEO
> counseling is a mandatory first step to
> pursuing a claim of discrimination in the EEO
> process, and the agency must provide the

>           counseling to any "aggrieved person" who
>           requests it.  *See* 29 CFR 1614.104.  This
>           office has processed your client's pre-
>           complaint as required.  The Commission has,
>           nevertheless, held consistently that claims
>           of unlawful discrimination brought by foreign
>           nationals employed by agencies outside the
>           United States do not come within the purview
>           of the EEOC Regulations [citations omitted].
>           Therefore, your client's claim of
>           discrimination is hereby dismissed for
>           failure to state a claim in accordance with
>           29 CFR 1614.103, 29 CFR 1614.104 and 29 CFR
>           1614.105.

*Id*. at 2 (emphasis added).[5]

    In this action, Licudine asks this Court to "confirm [his] having been a U.S. citizen . . . when born in [the] 'Commonwealth of the Philippine Islands,'" such that "the Department of the Navy allow[s] [him] to come within the meaning of the Civil Rights Act of 1964 in Title VII."  Compl. at 7.

## II.  DISCUSSION

    Defendant moves to dismiss under Fed. R. Civ. P. 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted.  Although the suit has glaring procedural problems, it seems most efficient to go straight to the core of the issue the suit seeks to address, which is whether Licudine is a citizen of the United States, as he argues he is, or a citizen

---

[5]    The Navy also dismissed Licudine's claim of discrimination on the basis of reprisal.  *See* Compl., Attach. (Notice of Dismissal of Formal Complaint, DON # 08-61581-00514) at 2.  It does not appear that Licudine challenges this portion of the agency determination.

of the Philippines, as the defendant argues he is.  If the latter, then Licudine is an alien to whom Title VII does not apply.  *See* P. & A. in Support of Def.'s Mot. to Dismiss ("Def.'s Mot.") at 2-5.

    *A.  The Territorial Period of the Philippine Islands*

To provide the proper context for Licudine's arguments, the Court briefly reviews the relationship between the United States and the Philippines during the territorial period, that is, the time from December 10, 1898 through July 4, 1946 during which the Philippines was a territorial possession of the United States. *See Lacap v. Immigration & Naturalization Serv.*, 138 F.3d 518 (3d Cir. 1998) (per curiam).  *Amicus* has thoroughly researched the question and concludes that, "[f]rom the time the United States obtained dominion over the Philippines in 1899 until it granted independence to the islands in 1946, [the United States] Congress classified natives of the Philippines as Philippine citizens, as non-citizen United States nationals, and as aliens, but never as United States citizens."  Amicus Curiae's Mem. of Law in Response to Def.'s Mot. to Dismiss ("Amicus Mem.") at 3.

"At the close of the Spanish-American War on December 10, 1898," *Rabang v. Immigration & Naturalization Serv.*, 35 F.3d 1449, 1450 (9th Cir. 1994), *cert. denied sub nom. Sanidad v. Immigration & Naturalization Serv.*, 515 U.S. 1130 (1995), "[t]he archipelago known as the Philippine Islands was ceded to the

5

United States by Spain effective April 11, 1899," *Cabebe v. Acheson*, 183 F.2d 795, 798 (9th Cir. 1950), through the Treaty of Paris, *id.* at 802 n.11.  *See* Treaty of Peace between the United States of America and the Kingdom of Spain, U.S.-Spain, art. III, Dec. 10, 1898, 30 Stat. 1754 ("Treaty of Paris").  The Treaty of Paris offered Spanish subjects then residing in the Philippine Islands the option of retaining their Spanish nationality, either by leaving the Philippines or by remaining in the Philippines and declaring their allegiance to Spain within a set time period. *Cabebe*, 183 F.2d at 798.  Except for those Spanish subjects who opted to retain their Spanish nationality, the inhabitants of the Philippine Islands as of April 11, 1898 were "held to have adopted the nationality of the territory in which they may reside."  Treaty of Paris, art. IX, 30 Stat. at 1759.  The Treaty of Paris further provided that "[t]he civil rights and political status of the native inhabitants of the [Philippines] shall be determined by the Congress [of the United States]."  *Id.*  In effect, these inhabitants had become United States nationals, but not United States citizens.[6]  *See Cabebe*, 183 F.2d at 798.

---

[6]     The term "national" refers to a hybrid status of persons who inhabited territories over which the United States exercised control.  *See Rabang*, 35 F.3d at 1452 n.5 (citation omitted); *Cabebe*, 183 F.2d at 797-98.  "[W]hile all United States citizens were nationals, not all nationals were citizens."  *Cabebe*, 183 F.2d at 797-98.  A "national of the United States" currently is defined as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes permanent allegiance to

(continued...)

Until 1902, "the United States maintained military rule over the Philippine Islands." *Rabang*, 35 F.3d at 1450 (citation omitted).  In 1902, Congress enacted the Philippine Government Act, ch. 1369, 32 Stat. 691 (1902), which "established the terms of the United States' civilian rule over the Philippines. *Rabang*, 35 F.3d at 1450.  It also provided that the inhabitants of the Philippine Islands as of April 11, 1899, and their children born subsequently, were deemed "citizens of the Philippine Islands and as such entitled to the protection of the United States."  Sec. 4, 32 Stat. at 692.  Further, the Philippine Government Act expressly stated that "the Constitution and laws of the United States would not apply to the Philippines."  *Rabang*, 35 F.3d at 1450. (citing Sec. 1, 32 Stat. at 692).

In 1916, Congress enacted the Philippine Autonomy Act, ch. 416, 39 Stat. 545 (1916), declaring "the purpose of the people of the United States as to the future political status of the people of the Philippine Islands, and to provide a more autonomous government for those islands."  *Rabang*, 35 F.3d at 1450-51 (citing Sec. 1, 39 Stat. at 545).  Again, Congress deemed the inhabitants of the Philippines "citizens of the Philippine Islands."  *Id.* (citing Sec. 2, 39 Stat. at 546).

---

[6](...continued)
the United States."  8 U.S.C. § 1101(a)(22).

The United States did not intend to retain sovereignty over
the Philippines, and to this end, Congress enacted the Philippine
Independence Act (also known as the Tydings-McDuffie Act of
1934), ch. 84, 48 Stat. 456 (1934), which set forth "the
procedure by which the independence of the Philippines was to be
accomplished." *Cabebe*, 183 F.2d at 799.  This Act established
the Philippines as a Commonwealth, *see id.*, and provided for "the
complete withdrawal of United States sovereignty ten years after
the adoption of a Philippine constitution." *Rabang*, 35 F.3d at
1451 (citing Sec. 1, 48 Stat. at 463).  When these conditions
precedent had been met:

> On the 4th day of July immediately following
> the expiration of a period of ten years from
> the date of the inauguration of the new
> government under the constitution provided
> for in this Act, the President of the United
> States shall by proclamation withdraw and
> surrender all right of possession,
> supervision, jurisdiction, control, or
> sovereignty then existing and exercised by
> the United States in and over the territory
> and people of the Philippine Islands,
> including all military and other reservations
> of the Government of the United States in the
> Philippines . . ., and, on behalf of the
> United States, shall recognize the
> independence of the Philippine Islands as a
> separate and self-governing nation and
> acknowledge the authority and control over
> the same of the government instituted by the
> people thereof, under the constitution then
> in force.

Sec. 10(a), 48 Stat. at 463 (codified at 22 U.S.C. § 1394(a)).
The Philippine Independence Act further provided that "citizens

of the Philippine Islands who were not also citizens of the
United States were to be considered 'aliens' under the
immigration laws of the United States." *Rabang*, 35 F.3d at 1451
(citing Sec. 8(a)(1), 48 Stat. at 462).

On July 4, 1946, Harry S. Truman, the President of the
United States, proclaimed that the United States withdrew and
surrendered its control and sovereignty over the Philippine
Islands, "thus ending their status as a United States territory."
*Rabang*, 35 F.3d at 1451; *see* Independence of the Philippines
Proclamation, Proclamation No. 2695, 60 Stat. 1352, 11 Fed. Reg.
7517 (July 4, 1946).

### B.   *Licudine Is Not A United States Citizen*

Licudine, born in the Commonwealth of the Philippines during
its territorial period, argues that he is a citizen both of the
Philippines and of the United States because he was born within
the territorial limits of the United States. *See* Compl. at 2.
He asserts that the "United States and the Philippine
Islands . . . constitute[d] a single state" during the
territorial period because the United States exercised ultimate
control over the territory and inhabitants of the Philippine
Islands, *see id.* at 6, notwithstanding the establishment of a
civilian government and the enactment of legislation by the
United States Congress designed to bring about Philippine
independence. *See* Amicus Mem. at 7-9.  Licudine maintains that

9

"those born on or after November 15, 1935 but before July 4,
1946, were citizens of the United States under the doctrine of
'jus soli,' they being borned [sic] in the continental US where
they reside and were also citizens of the Philippine Islands
(dual citizenship) as called for under the US CONSTITUTION in its
Fourteenth Amendment."  Compl. at 6.

Licudine prevails only if the Commonwealth of the
Philippines was considered a part of the United States at the
time of his birth.  Existing case law does not support his
position, as the United States Courts of Appeals for the Second,
Third, and Ninth Circuits hold that a person's birth in the
Philippines during the territorial period is not birth in the
United States for purposes of the Fourteenth Amendment.  *See*
*Valmonte v. Immigration & Naturalization Serv.*, 136 F.3d 914, 920
(2d Cir.), *cert. denied*, 525 U.S. 1024 (1998); *Lacap*, 138 F.3d at
519 (adopting the "result and reasoning of the court in *Rabang*"
and noting the Second Circuit's ruling in *Valmonte*); *Rabang*, 35
F.3d at 1452.  The Court is persuaded by the reasoning of these
decisions, and concurs with *amicus curiae*'s assessment that "[i]n
none of the three major pieces of legislation enacted between
1902 and 1934 did Congress classify natives of the Philippines as
United States citizens."  Amicus Mem. at 11.

In *Rabang*, the plaintiffs in the course of deportation
proceedings brought against them by the Immigration and

10

Naturalization Service argued that "they or their parents were born in the Philippines during the territorial period, that during this time the Philippine Islands were 'in the United States,' and that plaintiffs were subject to the jurisdiction of the United States at their birth." *Rabang*, 35 F.3d at 1451. These plaintiffs claimed, then, that they or their parents were "constitutionally entitled to citizenship" by virtue of their birth "in the United States." *Id*. The Ninth Circuit held that "birth in the Philippines during the territorial period does not constitute birth 'in the United States' under the Citizenship Clause of the Fourteenth Amendment, and thus does not give rise to United States citizenship." *Id.* at 1452. The Ninth Circuit found that the "Citizenship Clause has an express territorial limitation which prevents its extension to every place over which the [United States] government exercises its sovereignty." *Id.* at 1453. For this reason, citizenship was not extended "to persons living in United States territories simply because the territories are 'subject to the jurisdiction' or 'within the dominion' of the United States." *Id.*; *see Friend v. Reno*, 172 F.3d 638, 645 (9th Cir. 1999) (holding that residence in the Philippines during its territorial period did not constitute residence in the United States, such that "a parent's residence in the Philippines in 1931 did not permit that parent to transfer

his U.S. citizenship to his children"), *cert. denied*, 528 U.S. 1083 (2000).

In *Valmonte*, the petitioner appealed to the Second Circuit a decision of the Board of Immigration Appeals which denied her application for suspension of deportation and ordered her deported to the Philippines. *Valmonte*, 136 F.3d at 915. The petitioner, who was born in the Philippines in 1934, argued that, "[b]ecause the United States exercised complete sovereignty over the Philippines during its territorial period, . . . she therefore [was] a citizen by virtue of her birth within the territory and dominion of the United States." *Id.* at 919. She asserted that "the term 'the United States' in the Fourteenth Amendment should be interpreted to mean 'within the dominion or territory of the United States.'" *Id.* (citing *Rabang*, 35 F.3d at 1459 (Pregerson, J., dissenting )). The Second Circuit rejected this argument, holding that, consistent with the majority in *Rabang*, "persons born in the Philippines during its status as a United States territory were not born in the United States under the Fourteenth Amendment." *Id.* at 920 (internal quotation marks and citation omitted). The petitioner was not a United States citizen under the Fourteenth Amendment, and, therefore, her petition was denied. *Id.* at 921.

In *Lacap*, the petitioner was born in the Philippines in 1951 and entered the United States illegally in 1991. *Lacap*, 138 F.3d

at 518.   During deportation proceedings, he "conceded that he was a citizen of the Philippines and was subject to deportation," but later argued that he was a citizen of the United States by birth, because his parents were born in the Philippines during the territorial period, and that, because of his citizenship, he could not be deported.   *Id.* at 519.   The Third Circuit summarily rejected this argument, "agree[ing] with the result and reasoning of the court in *Rabang*."   *Id.*

Consistent with the rulings of these Circuits, this Court concludes that Licudine's birth in the Philippines during its territorial period does not constitute birth in the United States for purposes of the Citizenship Clause of the Fourteenth Amendment.   Licudine, then, is not a United States citizen by birth.

### C.   *Licudine Is Not A United States National*

Nor, as defendant persuasively argues, *see* Def.'s Mot. at 3-5, is Licudine a United States national.

In *Cabebe*, the appellant, born in the Philippine Islands in 1910, applied for a United States passport, and "the application was denied on the single ground that by virtue of and since the July 4, 1946, Presidential proclamation of Philippine independence. . ., appellant became and is an alien of the United States and hence is not entitled to a United States passport." *Cabebe*, 183 F.2d at 796.   The appellant did not claim United

States citizenship, and his argument rested solely on his alleged status as a national owing his allegiance to the United States. *Id.* The Ninth Circuit remarked that "nationality depends primarily upon the place of birth, the common law principle of jus soli having been embodied in the Fourteenth Amendment of the Constitution of the United States." *Id.* at 797. The Treaty of Paris had the effect of making the inhabitants of the Philippines, save those who retained their Spanish nationality, into United States nationals. *Id.* at 798. "Filipinos were not made citizens of the United States by the Treaty of Paris," however. *Id.* at 799. Rather, by operation of the Philippine Independence Act, the inhabitants of the Philippines were divested of their status as United States nationals:

> [T]he Philippine Independence Act . . . stated the procedure by which the complete independence of the Philippine Islands was to be accomplished. In short, it authorized a constitutional convention to draft a constitution for the government of the newly named Commonwealth of the Philippine Islands, specified certain required provisions, and provided that after the President of the United States certified its conformance thereto the proposed constitution be submitted for ratification to the Philippine voters. It was further declared that on July 4th of the next following the expiration of a period of 10 years from the date of inauguration of the new government under such constitution, the President of the United States would proclaim the complete independence of the Philippine Islands and the people thereof. By its terms the Act was not effective until accepted by concurrent resolution of the Philippine legislature or

14

> by a convention called for the purpose of
> passing on such question.  <u>As of the date of
> such acceptance (which occurred in fact on
> May 1, 1934)</u>, it was provided in Section
> 8(a)(1) of the Act that '(f)or purposes of
> [United States immigration laws], . . .
> <u>citizens of the Philippine Islands who are
> not citizens of the United States shall be
> considered as if they were aliens</u>.'

*Id.* (internal footnotes and citation omitted) (emphasis added).
Filipinos obtained "[t]he status of United States
nationality . . . [as] the direct result of the United States'
assumption of sovereignty over the islands," and when the United
States relinquished its sovereignty over the Philippine Islands
in 1946, "Filipino nationals of the United States inhabiting the
Islands . . . lost the status of nationality." *Id.* at 800.  Even
if Licudine were a United States national at the time of his
birth, he ceased to be a United States national as of July 4,
1946.  At that point, he was considered an alien under United
States immigration laws.

   D.  *Licudine is an "Alien" for Purposes of Title VII*

        Generally, discrimination in employment with the federal
government, including the military departments, on the basis of
national origin is prohibited.  *See* 42 U.S.C. § 2000e-16(a); 29
C.F.R. §§ 1614.101(a), 1614.103(a), (b).  "[I]ndividual . . .
complaints of employment discrimination and retaliation
prohibited by [T]itle VII (discrimination on the basis of race,
color, religion, sex and national origin) . . . [are] processed

15

in accordance with [29 C.F.R. Part 1614]," Federal Sector Equal Employment Opportunity.  29 C.F.R. § 1614.103(a).  However, these provisions do not apply to "aliens employed in positions . . . located outside the limits of the United States."  29 C.F.R. § 1614.103(d)(4).  An "alien" is "any person not a citizen or national of the United States."  8 U.S.C. § 1101(a)(3).

Licudine is neither a United States citizen nor a United States national.  The Court therefore concludes that he is an alien to whom Title VII does not apply.

### III.   CONCLUSION

Because Licudine is an alien who was employed by the United States Navy outside of the United States, Title VII of the Civil Rights Act of 1964, as amended, does not apply to him.  The Court grants defendant's motion and dismisses this civil action.  An Order accompanies this Memorandum Opinion.


                              JAMES ROBERTSON
                      United States District Judge